Alan P. Fraade (AF 9602)
**The Mintz Fraade Law Firm, P.C.**
271 Madison Avenue, 12th Floor,
New York, New York 10016
Tel: (212) 486-2500 | Fax: (212) 486-0701
Attorney for Plaintiff

Gary H. Baise (DC Bar #194878)
600 New Hampshire Ave., NW, Suite 500
Washington, D.C. 20037
Tel: (202) 518-6345 | Fax: (202) 234-3550
Attorney for Plaintiff

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
-------------------------------------------------------------------X  Index No.

Steven Jude Hoffenberg, individually, and as
constructive trustee of the Noteholders and
Bondholders of Towers Financial Corporation,

                            Plaintiff,

                                                     **COMPLAINT**

United States of America,

                            Defendant.
-------------------------------------------------------------------X

       Steven Jude Hoffenberg ("Mr. Hoffenberg") as the Plaintiff, individually, and as

constructive trustee of the Noteholders and Bondholders of Towers Financial Corporation, in this

adversary proceeding, (hereinafter referred to as this "Complaint") by his counsel, Alan P.

Fraade, Esq. and Gary H. Baise, Esq., brings this Complaint against the United States of

America, the Defendant, as follows:

                              **JURISDICTION AND VENUE**

       1.     This Court has subject matter jurisdiction over this action against the Defendant

pursuant to 28 U.S.C. § 1346(b), § 2674, § 2671 and § 2679(a) in that the controversy arises

under the Federal Tort Claims Act.

2.      The venue is proper in this district pursuant to 28 U.S.C § 1391(b) and 1402(b) in that at all times relevant hereto, all acts and/or omissions of the Defendant and the events giving rise to the claims in this action occurred in this judicial district.

## PARTIES

3.      At all times relevant hereto, Plaintiff Mr. Hoffenberg, a resident of the State of New York, was an inmate incarcerated at the Federal Correctional Institution in Fort Dix in the State of New Jersey ("FCI Fort Dix") from January, 2002, to October, 2013.

4.      FCI Fort Dix is operated by the Federal Bureau of Prisons (the "BOP"), which is a subdivision of the U.S. Department of Justice ("USDOJ"). The headquarters of the BOP and the USDOJ are located in the District of Columbia.

5.      In or around 1997, Mr. Hoffenberg was convicted for securities frauds committed at his company, Towers Financial Corporation ("Towers"), which resulted in more than $400 million in losses to Noteholders and Bondholders who purchased Bonds and Promissory Notes sold by Towers during the period between mid-1980s and mid-1990s, (the "Towers Fraud").

6.      Pursuant to a Sentencing Opinion dated March 4, 1997, issued by the Honorable Sweet, D.J., with respect to the Towers Fraud, (the "Sentencing Opinion") Mr. Hoffenberg must make restitution in the amount of $475,157,340, plus interest, which is now a total of approximately one billion ($1,000,000,000) dollars, to the victims of the Towers Fraud, *i.e.* the Noteholders and Bondholders.

7.     This claim arises from a breach of duty and damage to, or loss of property, caused by the negligent wrongful acts or omissions of the staff in the Central Office Inmate Monitoring Section of the BOP located in the District of Columbia, (the "CIM Staff") while acting within the scope of their offices or employment as employees of the United States of America (hereinafter referred to as the "Defendant"), whereby the Defendant, if a private person, would be liable for such negligent wrongful acts or omissions in accordance with the law of the place where the act or omission occurred.

8.     At all times relevant hereto, the negligent wrongful acts or omissions by the Defendant, by and through its agents, employees and servants, *i.e.* the CIM Staff, occurred in the offices of the BOP, which is located in the District of Columbia.

## STATEMENT OF FACTS

### A.  Towers Financial Corporation and "The Talented Mr.  Epstein"

9.     From 1975 through April 1993, Mr. Hoffenberg served as Chief Executive Officer of Towers, a corporation which owned and conducted business through over ten (10) operating subsidiaries, which provided financial services and assistance to its clients, and generated substantial revenues per year.

10.     Jeffrey Epstein ("Mr. Epstein," also referred to as "The Talented Mr. Epstein" in the March 2003 issue of the magazine, VANITY FAIR) was hired full-time as the associate of Mr. Hoffenberg and as the expert consultant in financial services including raising capital by selling securities. His services included assisting Mr. Hoffenberg full-time in all matters of business

operations and management of Towers, including, but not limited to, raising capital.

11.     Mr. Epstein's consultation services included, among others, creating and executing a scheme to finance bids to take over Pan American Airways, Inc. ("Pan Am") in 1987 and Emery Air Freight Corp. ("Emery") in 1988 through Tower's acquisition of a controlling interest in United Diversified Corporation ("UDC") and, as a result, UDC's two ailing subsidiaries, Associated Life Insurance Co. and United Fire Insurance Co., (the "Subsidiaries"). United States v. Hoffenberg, 94 Cr. 213 (RWS), 95 Cr. 321 (RWS), 1997 U.S. Dist. LEXIS 2394, at *2 (S.D.N.Y. Mar. 4, 1997).

12.     Mr. Epstein's fraudulent schemes included, among others, trading, buying and selling securities in order to generate a profit for Towers and UDC and its Subsidiaries; and because he did not have a broker's license, Mr. Epstein traded, sold and purchased stock through others.

13.     In order to win approval for the Acquisition by the Illinois Department of Insurance, Mr. Hoffenberg, Mr. Epstein and other individuals of Towers, promised to invest new capital in the amount of $3,000,000 in each of the Subsidiaries pursuant to the Acquisition. *Id.* Instead, however, they fraudulently utilized $3,000,000 of the Subsidiaries' bonds as collateral in securities brokerage accounts in order to purchase Pan Am and Emery stocks. *Id.* at *2-3.

14.     The Subsidiaries suffered trading losses of over $80,000 as a result of the failed attempt to acquire Pan Am and losses of over one million ($1,000,000) dollars as a result of the failed attempt to acquire Emery, as the Emery stocks were purchased with funds borrowed by using the Subsidiaries' bonds as collateral.

15.     Mr. Epstein manipulated the price of Emery stock to minimize the losses which occurred when Mr. Hoffenberg's bids failed and the share price began to fall. This involved multiple clients' accounts which were controlled by Mr. Epstein.

16.     In 1991, James W. Schacht, acting Director of Insurance of the State of Illinois, in his capacity as Conservator of UDC and as Liquidator of UDC's Subsidiaries, ("Mr. Schacht") sued Mr. Hoffenberg, Towers and several other individuals, executives and directors of Towers; Mr. Hoffenberg settled the lawsuit (the "Insurance Lawsuit").

17.     Although Mr. Epstein was never deposed or named a defendant in the Insurance Lawsuit, the Complaint submitted by Mr. Schacht alleged that Mr. Epstein was a recipient of improper disbursement of funds in the form of checks which were drawn from accounts of UDC and its Subsidiaries.

18.     As was alleged in the Complaint filed by Mr. Schacht, Mr. Epstein received monthly checks in the amount of $25,000 and received an aggregate total of approximately $215,000 for his services including broker's fees on investment advice.

19.     In late-1980s, Mr. Hoffenberg, Mr. Epstein and other individuals at Towers devised a plan to raise capital for Towers by selling Promissory Notes, which were sold pursuant six (6) separate private placement offerings and induced potential investors by providing fraudulent financial statements.

20.     In or around July 1990, Mr. Hoffenberg, Mr. Epstein and other individuals at Towers devised a plan to raise additional capital and to expand Towers by engaging in the

fraudulent sale of a series of Bonds, which were sold pursuant to five (5) separate private placement memoranda and induced potential purchasers by providing fraudulent financial statements.

21.     Although Towers was allegedly insolvent from 1988, in or about 1989, the Securities and Exchange Commission ("SEC") commenced an investigation of the Towers Fraud, which involved the fraudulent sales of Towers' securities, *i.e.* Bonds and Promissory Notes.

22.     Mr. Hoffenberg settled the civil fraud charges which were filed against him by the SEC in or around February 1993.

23.     In or around March 1993, Towers filed for Chapter 11 bankruptcy protection, (the "Bankruptcy Proceeding") and the Noteholders and Bondholders filed petitions with the Bankruptcy Court to support their loss claims. See In re Towers Financial Corporation, et al., Case No. 93-B-41558 (PBA) (Dec. 8, 1994)

24.     In or around April 1996, the Bankruptcy Court determined that the claims of the Noteholders and Bondholders in the total amount of $475,157,340 were valid claims.

25.     On or about April 20, 1995, Mr. Hoffenberg entered a guilty plea in the District Court of Southern District of New York to the charges brought against him with respect to the Towers Fraud.

26.     In United States v. Hoffenberg, 1997 U.S. Dist. LEXIS 2394 (S.D.N.Y. Mar. 4, 1997), the District Court convicted Mr. Hoffenberg of conspiracy to violate securities laws by

fraudulently selling securities in violation of 18 U.S.C. § 371, mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1342, conspiracy to obstruct justice in violation of 18 U.S.C. § 371, and tax evasion in violation of 26 U.S.C. § 7201.

27.     In the Sentencing Opinion, Mr. Hoffenberg was sentenced to twenty (20) years of imprisonment, followed by three (3) years of supervised release, a fine of one million ($1,000,000) dollars and to make restitution in the amount of $475,157,340, plus interest at nine (9%) percent per annum, which is now a total of approximately one billion ($1,000,000,000) dollars, which represents the losses as determined by the Bankruptcy Court, owed.to the victims of the Towers Fraud, *i.e.* the Noteholders and Bondholders.

28.     Upon information and belief, Mr. Epstein continues to control a fifty billion ($50,000,000,000) dollar hedge fund (the "Epstein Hedge Fund") which was incorporated and created entirely with all of the fraudulently acquired money from Towers, from which the Noteholders and Bondholders are entitled to the restitution payment in the amount of $475,157,340, plus interest, which is now a total of approximately one billion ($1,000,000,000) dollars.

29.     Mr. Hoffenberg, for over 18 years including his years at FCI Fort Dix, has made every effort and exhausted every possible remedy by submitting over five hundred (500) letters and filing over three thousand (3,000) Administrative Remedy Requests, all of which pointed to the negligent acts of, and/or failure to act by, the CIM Staff, in order to expose Mr. Epstein and the Epstein Hedge Fund as the source for the $475,157,340, plus interest, which is now a total of approximately one billion ($1,000,000,000) dollars, owed to the Noteholders and Bondholders.

30.     The Defendant, by and through its agents, employees and servants, *i.e.* the CIM Staff at the offices of the BOP located in the District of Columbia, continuously denied the means for Mr. Hoffenberg to make restitution and fulfill his financial obligations and hindered the transfer of the $475,157,340, plus interest, which is now a total of approximately one billion ($1,000,000,000) dollars, from its wrongful holder, the Epstein Hedge Fund, to the rightful owners, the Noteholders and Bondholders who are victims of the Towers Fraud.

**B.  CIM Staff's Failure to Enforce the Rights of Victims in Violation of a Court Order**

31.     On or around July 19, 2001, Mr. Hoffenberg was placed within the Central Inmate Monitoring System (the "CIM") of the BOP, which is operated from offices located in the District of Columbia.

32.     The CIM is a system by which the BOP monitors, controls and is responsible for certain inmates who present special needs for management, including, but not limited to, the transfer, temporary release and community activities of such inmates.

33.     CIM inmates, known as "CIM cases," receive special supervision by the CIM Staff and either require special management, security and/or protection for themselves or to protect other inmates from them.

34.     In or around June 29, 2012, Mr. Hoffenberg was notified of his "CIM assignment of Separation".

35.     A CIM separatee status designates inmates who may not be confined in the same institution with other specified individuals who are presently housed in federal custody or who

may come into federal custody in the future. Factors considered in classifying an individual to this assignment include, but are not limited to, testimony provided by or about an individual (in open court, to a grand jury, etc.), and whether the inmate has exhibited aggressive or intimidating behavior towards other specific individuals, either in the community or within the institution. This assignment may also include inmates from whom there is no identifiable threat, but who are to be separated from others at the request of the Federal Judiciary or U.S. Attorneys.

36.     Mr. Hoffenberg was 56 years old when he was designated as a CIM separatee despite having neither posed a threat to anyone nor risked the safety and orderly operation of FCI Fort Dix or the BOP, which would require such higher level of review.

37.     The CIM staff failed to comply with the BOP Program Statement 5290.15, Central Inmate Monitoring System, and failed to perform mandatory duties set forth in the CIM Operations Manual designated "Limited Official Use Only," access to which is precluded by specific policies.

38.     During Mr. Hoffenberg's incarceration from January, 2002 to October, 2013, the CIM Staff continuously denied Mr. Hoffenberg telephone privileges to make legal calls to his attorneys and, on numerous occasions, seized Mr. Hoffenberg's legal documents and court papers with respect to the Towers Fraud litigation which were necessary to make restitution as ordered in the Sentencing Opinion.

39.     On or around March 18, 2008, Mr. Hoffenberg's property, e.g. legal documents with respect to the Towers Fraud litigation and restitution, were seized by the unit manager, Richard Herbik.

40.     In order to fulfill his obligations to make the court-ordered restitution in the amount of $475,157,340, plus interest, which is now a total of approximately one billion ($1,000,000,000) dollars, Mr. Hoffenberg required frequent and unlimited telephone access with his attorneys and legal staff and access to his legal documents on a daily basis to pay the victims of the Towers Fraud.

41.     According to the Admission and Orientation Handbook of FCI Fort Dix, inmate telephone calls are limited to 300 minutes per month and limited to 15 minutes per call. Such limitation is the generally established rule for all local Federal prisons operated by the BOP.

42.     In order to facilitate the transfer and payment of a large amount of money, *i.e.* $475,157,340, plus interest, which is now a total of approximately one billion ($1,000,000,000) dollars, to several individuals, *i.e.* victims of the Towers Fraud, across the country, such a transaction would obviously require more than five (5) hours per month and the phone calls would obviously exceed the 15 minutes per call limitation.

43.     Pursuant to Program Statement 5264.07, <u>Telephone Regulations for Inmates</u>, the BOP provides each inmate with several methods to maintain confidential contact with his or her attorney and frequent confidential inmate-attorney calls should be allowed only when an inmate demonstrates that communication with his or her attorney by other means, e.g. written or electronic correspondence and visits, is not adequate.

44.     Mr. Hoffenberg needed comparable unimpeded and frequent access to the telephones to make legal calls to his attorneys and legal staff who were involved in the approximately one billion dollar transaction in order to make restitution as per the Sentencing

Opinion. Such a large transaction, even in normal business practice, requires consistent and frequent communication with the parties involved and their respective attorneys.

45.     The CIM Staff incorrectly presented the voluntary Inmate Financial Responsibility Program of the BOP pursuant to Program Statement Number 5380.07 (the "IFRP") to Mr. Hoffenberg with respect to his restitution.

46.     The IFRP was inapplicable to Mr. Hoffenberg because the Sentencing Opinion did not stipulate any repayment schedule. Moreover, restitutions of such large amounts do not qualify for the IFRP.

47.     At Mr. Hoffenberg's refusal to participate in the IFRP for the foregoing reasons, the CIM Staff repeatedly denied telephone access to make legal calls and seized Mr. Hoffenberg's property, *i.e.* the legal documents with respect to the Towers Fraud litigation. The CIM Staff exhibited a pattern of continuous negligence in obstructing the means by which Mr. Hoffenberg would be able to make restitution

48.     The CIM Staff has claimed that they are not bound by the Federal Court ordered restitution pursuant to the Sentencing Opinion.

49.     The CIM Staff at the BOP offices located in the District of Columbia failed to commit the resources necessary to ensure that the rights of the victims of the Towers Fraud are enforced.

50.     For over 18 years including his years at FCI Fort Dix, Mr. Hoffenberg relentlessly attempted to make restitution in the amount of $475,157,340, plus interest, which is now a total

of approximately one billion ($1,000,000,000) dollars, to the victims of the Towers Fraud, *i.e.* the Noteholders and Bondholders, pursuant to the Sentencing Opinion.

51.     For over 18 years including his years at FCI Fort Dix, Mr. Hoffenberg submitted over five hundred (500) letters and filed over three thousand (3,000) Administrative Remedy Requests, all of which pointed to the negligent acts of, and/or failure to act by, the CIM Staff including, but not limited to, continuously denying court access, telephone privileges, Mr. Hoffenberg's correspondence with his attorneys and visits from his attorneys.

52.     The negligent acts of, and/or failure to act by, the CIM Staff obstructed and delayed Mr. Hoffenberg's ability to make restitution in the amount of $475,157,340, plus interest, which is now a total of approximately one billion ($1,000,000,000) dollars, to the victims of the Towers Fraud, pursuant to the Sentencing Opinion.

53.     Commencing in 2008, Mr. Hoffenberg repeatedly sought medical care and attention from the Defendant, by and through its employees, agents and servants, for medical injuries including spinal slipped discs, torn rotator cup on his right shoulder and injuries to his hips and legs and for his heart condition, recurring pain in his limbs and back and internal injuries. Notwithstanding such requests, Defendant refused and failed to properly treat and care for Mr. Hoffenberg.

54.     Since his release, Mr. Hoffenberg has had three heart surgeries for conditions caused by his time serving at FCI Fort Dix while within the care of the CIM Staff. He now suffers a lifetime impediment.

**C. Exhaustion of Central Office Administrative Remedies**

55.     During his period of incarceration from Jan 2002 to Oct 2013, Mr. Hoffenberg sent over five hundred (500) letters to the CIM Staff and filed over three thousand (3,000) Administrative Remedy Requests to the Defendant, by and through its agents, employees and servants at the BOP Regional Office and to the BOP Central Office located in the District of Columbia; such Administrative Remedy Requests set forth that Mr. Hoffenberg was wrongfully denied certain privileges including, but not limited to, telephone privileges such as legal calls to his attorneys and legal staff, that his property was wrongfully seized and he was denied access to his legal documents, and that he was suffering recurring and ongoing health issues as a result of failure of treatment.

56.     All of Mr. Hoffenberg's Administrative Remedy Requests and Appeals were denied by the CIM Staff at the Central Office of the BOP located in the District of Columbia, which is the final review.

57.     Despite the in excess of 3,000 Administrative Remedy Requests and Appeals filed by Mr. Hoffenberg from January, 2002 to October, 2013, the CIM Staff at the BOP offices located in the District of Columbia continuously failed to commit the resources necessary to ensure that the rights of the victims of the Towers Fraud are enforced

58.     On or about September 29, 2015, Mr. Hoffenberg filed a claim with the Defendant by filing same with the Federal Bureau of Prisons, a Department of the United States of America, as recorded under Federal Tort Administrative Claim number TRT-NER-2016-00395 (the "Administrative Claim").

59.     On or about October 26, 2015, the Defendant denied the Administrative Claim of Mr. Hoffenberg.

60.     This legal action was duly commenced within six (6) months after the denial of the Administrative Claim.

61.     Damages to, and/or loss of property of, Mr. Hoffenberg, as a constructive trustee of the victims of the Towers Fraud were proximately caused by the negligent conduct, actions and/or failure to act by the CIM Staff of the BOP, which offices are located in the District of Columbia.

62.     Accordingly, the Defendant, by and through its agent, employees and servants, *i.e.* the CIM Staff, is liable to Plaintiff Mr. Hoffenberg, individually and on behalf of the Noteholders and Bondholders of Towers, pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and  2672, in an amount to be determined at trial, with additional damages.

## FIRST CAUSE OF ACTION

63.     Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs "1" through "62" with the same force and effect as if more fully set forth herein.

64.     On or about April 20, 1995, Mr. Hoffenberg entered a guilty plea to the charges brought against him with respect to the sale of fraudulent securities and pursuant to the Sentencing Opinion, Mr. Hoffenberg must make restitution of $475,157,340, plus interest, which is now a total of approximately one billion ($1,000,000,000) dollars.

65.     The victims of the Towers Fraud, which include over 200,000 individuals who are directly or indirectly Noteholders and Bondholders of Towers, are entitled to Mr. Hoffenberg's restitution of $475,157,340, plus interest, which is now a total of approximately one billion ($1,000,000,000) dollars, pursuant to the Sentencing Opinion, with respect to the sale of fraudulent securities.

66.     The Defendant, by and through its agent, employees and servants, *i.e.* the CIM Staff, has interfered with and obstructed Mr. Hoffenberg's numerous attempts to make restitution to the victims of Towers Fraud and, thereby, prevented the victims of the Towers Fraud from obtaining the property to which they are entitled.

67.     The negligent acts and/or omissions of the CIM Staff at the BOP offices located in the District of Columbia, include failing to act accordingly to its policies, specifically, as per the Program Statement Number 5380.07.

68.     As a direct and proximate failure of the Defendant by and through its agents, employees and servants, *i.e.* the CIM Staff, the Noteholders and Bondholders of Towers and Mr. Hoffenberg, acting as the constructive trustee acting on behalf of the Noteholders and Bondholders, have suffered damages to and loss of property caused by the negligent wrongful acts or omissions of the CIM Staff within the scope of their employment.


## SECOND CAUSE OF ACTION


69.     Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs "1" through "68" with the same force and effect as if more fully set forth herein.

15

70.     The Defendant, by and through the negligent wrongful acts and/or failure to act of its agents, employees and servants, *i.e.* the CIM Staff of the BOP, which offices are located in the District of Columbia, has continuously and repeatedly interfered with and obstructed Mr. Hoffenberg from making restitution of $475,157,340, plus interest, which is now a total of approximately one billion ($1,000,000,000) dollars.

71.     The CIM Staff, despite having received over 3,000 Administrative Remedy Requests and Appeals from Mr. Hoffenberg, negligently and continuously failed to commit the resources necessary to ensure that the rights of the victims of the Towers Fraud are enforced.

72.     As a result, the Defendant, by and through the negligent wrongful acts and/or failure to act of its agents, employees and servants, *i.e.* the CIM Staff of the BOP, which offices are located in the District of Columbia, continuously and repeatedly prevented the victims of the Towers Fraud from obtaining the property to which they are entitled for a period of over 11 years.

73.     None of the Noteholders nor the Bondholders who are the victims of the Towers Fraud have yet received payments of the $$475,157,340, plus interest, which is now a total of approximately one billion ($1,000,000,000) dollars, pursuant to the Sentencing Opinion.

74.     As a direct and proximate failure of the Defendant, by and through its agents, employees and servants, *i.e.* the CIM Staff, Mr. Hoffenberg and, consequently, the victims of the Towers Fraud continue to suffer, damages to and loss of property caused by the negligent wrongful acts or omissions of the CIM Staff within the scope of their employment in the offices of the BOP located in the District of Columbia.

**THIRD CAUSE OF ACTION**

75.     Plaintiff repeats, reiterates and re-alleges each and every allegation contained in paragraphs "1" through "74" with the same force and effect as if more fully set forth herein.

76.     The Defendant, by and through its agents, employees and servants, *i.e.* the CIM Staff, owed a duty to provide suitable quarters and provide for the safekeeping, care, and subsistence of Mr. Hoffenberg during his incarceration under the care and supervision of the CIM Staff at FCI Fort Dix, which is operated by BOP.

77.     The Defendant, by and through its agents, employees and servants, *i.e.* the CIM Staff, at the offices of the BOP located in the District of Columbia failed to provide for the safekeeping, care and subsistence of Mr. Hoffenberg for his recurring and ongoing health issues.

78.     As a direct and proximate failure of the Defendant, by and through its agents, employees and servants, *i.e.* the CIM Staff, Mr. Hoffenberg has suffered recurring and ongoing medical injuries and continues to suffer health conditions, *e.g.* several heart surgeries, after his release caused by injuries sustained during his incarceration under the care and supervision of the CIM Staff.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff respectfully requests that the Court enter judgment against the Defendant as follows:

17

(A) Ordering compensation in an amount to be determined at trial, with additional damages, for all general, special, incidental, and consequential damages suffered by the Plaintiff, individually, and on behalf of the Noteholders and Bondholders of Towers, as a result of the Defendant's negligent and wrongful conduct pursuant to 28 U.S.C. §§ 1346(b) and 2674;

(B)  Ordering compensation in an amount to be determined at trial, with additional damages, for all general, special, incidental, and consequential damages suffered by the Plaintiff, individually, and on behalf of the Noteholders and Bondholders of Towers, as a result of the Defendant's a continuous and repetitious wrongful and negligent acts, and/or failure to act, during the period of Mr. Hoffenberg's incarceration;

(C)  Ordering compensation in an amount to be determined at trial, with additional damages, for all general, special, incidental, and consequential damages suffered by the Plaintiff as a result of the Defendant's negligence and failure to provide standard medical care and treatment;

(D) Awarding Plaintiff his reasonable attorney's fees and costs, to the fullest extent allowed by law; and

(E)  Granting all such additional or further relief as this Court deems just and equitable under the circumstances

Dated: April 22, 2016

Alan P. Fraade (AF 9602)
*Attorney for Plaintiff*
The Mintz Fraade Law Firm, P.C.
271 Madison Avenue, 12th Floor
New York, New York 10016
Tel: (212) 486-2500

Gary H. Baise (DC Bar #194878)
*Attorney for Plaintiff*
600 New Hampshire Ave., NW, Suite 500
Washington, D.C. 20037
Tel: (202) 518-6345